THE GEORGE S. CHATFIELD COMPANY *vs.* THE CITY OF WATERBURY.

Third Judicial District, Bridgeport, April Term, 1914.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

Under the Act of 1895 (12 Special Laws, pp. 412, 413) the district committee of the Center school district of Waterbury was empowered to select and purchase school sites, whenever so directed by the legal voters of the district, provided the cost thereof was within the amount appropriated by the voters therefor. In 1899 the limits of Waterbury were extended to include the territory within the Center school district (13 Special Laws, p. 498), which was virtually abolished, a department of education was created under the control

of a board of education, and to this board were granted entire charge and direction of all the public schools of the district, "and all other powers of boards of education, school committees, and school visitors in this State," subject to the limitations of the Act. *Held:*—

1. That by abolishing the district and devolving the powers of its committee upon the board of education, in general terms, the legislature conferred the power to select and to purchase school sites upon the newly-created department of education, free from the control of any other municipal body, but in conformity, nevertheless, with the other provisions of the Act.

2. That the board of education could not, under the Act of 1899, buy nor agree to buy a school site without first securing an appropriation therefor as required by §§ 92 and 93 of the revised charter (12 Special Laws, pp. 434, 459), although such appropriation might be for a specific site already designated by the board of education, or for such site or sites as the board in its discretion might thereafter select.

3. That the appropriation of $40,000 in the present case, made by the board of aldermen for "new school and land, North End," in response to an estimate and request of the board of education for $60,000 for a "new Locust Street school" in the section of the city known as the "North End," was a special appropriation for a designated site and building; and that after such site had been procured and the school building constructed thereon, at a cost of $22,000, the unexpended balance of the appropriation reverted to the city treasury at the end of the fiscal year, as provided by the city charter, and the board of education could not use any portion of it either for another school site or for any other school purpose.

4. That a landowner, who contracted to sell his land to the board of education after its purchase of the site upon which the school building was erected, was bound to know the limitations upon the power of the board, as well as the provisions of the city charter affecting it, all of which became a part of his agreement.

The landowner's deed tendered to the city required it to assume a mortgage of $3,500 and a lien of $35. *Held* that this was not in accordance with his contract.

Appropriations of municipal funds, whether general or specific, for a given object or a definite purpose, cannot be diverted to any other purpose.

Argued April 14th—decided July 13th, 1914.

ACTION for the specific performance of a contract for the sale of land, or to recover damages for its breach, brought to and tried by the Superior Court in New Haven County, *Shumway, J.;* judgment for plaintiff

for $5,874, and appeal by the defendant. *Error and judgment for defendant directed.*

*Francis P. Guilfoile,* for the appellant (defendant).

*Nathaniel R. Bronson,* for the appellee (plaintiff).

WHEELER, J. The board of education of the city of Waterbury duly submitted to the board of finance its estimate for general and special expenses for the year 1912, and requested a special appropriation of $60,000 for "New Locust Street school, twelve rooms." This location is in that section of the city known as the "North End." The board of finance included in its estimate of expenses submitted to the board of aldermen, an item for "New School and Land North End, $50,000." The board of aldermen made the following appropriation: "No. 56, New School and Land North End, $40,000." No other appropriation was made by the board of aldermen for the year 1912 for the special expense for new school and land in the "North End."

Thereafter, in July, 1912, the board of education purchased a school site on Hill Street, located in the North End, and later caused plans for a four-room school to be prepared and the same built upon this site at a total cost of $22,000, including additional land purchased October 14th, 1912, and added to this site, and paid for the site and school building from the special appropriation of $40,000, leaving an unexpended balance of $18,000.

The board, in August, voted to purchase the Griggs lot on Division Street for a school, but later rescinded its vote. In the next year the board purchased this site, and it was paid for out of a special appropriation for that purpose made in 1913. It was located in the North End section.

In September, 1912, the plaintiff offered its option on the Chatfield site, so-called, located on Division Street opposite the Griggs site, and in the North End section. In the same month the board voted to accept the option and purchase this site for a school site. The board thereupon procured a search of title of the premises, and the plaintiff executed a deed, the form of which was approved by the city attorney. The plaintiff then handed the deed to the clerk of the board of education, who received it and placed it in the board's safe, where it remains. Thereafter the board approved the deed and search, and the plaintiff's bill for the purchase price. This bill was subsequently approved by the board of finance, and the city clerk drew his order, countersigned by the comptroller, on the treasurer of the city for the purchase price, $9,000. It was then presented to the mayor for his countersignature, but he refused so to sign.

The deed, as delivered to the city, required it to assume a mortgage of $3,500 and a lien of $35.02. The board of finance later rescinded its action approving this bill. The board of education has never taken possession of said site or assumed control over it.

Except as recited, the board of aldermen did not make any special appropriation for the purchase of the Chatfield site, nor direct nor authorize its purchase, and the board of education never requested an appropriation for that purpose.

One of the main grounds upon which the city resists payment of the plaintiff's bill is that the board of education is without power to select or purchase school sites, and that this power is vested in the city and its board of aldermen.

Under the Special Act of 1895 (12 Special Laws, pp. 412, 413) the district committee of the Center School District of Waterbury was given power to select, and

purchase school sites "whenever so directed by the legal voters of said Center School District," provided the cost thereof be within the amount appropriated therefor by the legal voters of the district. The power of the committee to act was thus made dependent upon a previous direction of the legal voters of the district, and upon the existence of an appropriation made therefor. Under a Special Act passed in 1899 (13 Special Laws, pp. 498–500) the territorial limits of the city of Waterbury were made to include those of the Center School District. A department of education was created, under the control of a board of education, to have the care and management of all the property and affairs of the Center School District. This board of education was given "entire charge and direction of all the public schools of said district," and all other powers of "boards of education, school committees, and school visitors in this State."

These broad powers were subject to the limitations of the Act. The board of education must submit to the board of finance a detailed estimate of its expenses for the next year. The latter board makes its own estimate of expenses of the several departments and submits these, together with a recommendation of such tax rate as it may deem necessary, to the board of aldermen. This board may accept these estimates or deduct or change any item and add new items by pursuing a defined course, and must make its appropriations upon the basis of its own estimates, and lay a tax to meet such estimated expenses.

The Act of 1899 provides: "After this Act shall take effect no meeting of said Center School District shall be held for any purpose whatever." By the legislative authority of this Act, the powers over, and the duties toward, the schools and school affairs of the district, ceased and passed to the department of education of

the city of Waterbury, subject to the limitations of the Act itself. The powers and duties, theretofore vested in the district and its committee, devolved upon the department of education, under the control of the board of education. The power to select and purchase school sites is not in exact terms given the department of education or its board. It is significant of the legislative intent that it is not, in terms, given another municipal body. Such duties are peculiarly within the province of a board of education. It, and it alone of all municipal bodies, possesses a knowledge of present and future educational needs, and has the practical experience in the use of such knowledge. The functions of a board of aldermen are primarily legislative. It cannot act in such matters with intelligence save through its committee or delegated agents, and its committee or agents are of temporary appointment without the ripened judgment of years of specialized study and service in a single field, such as a permanent educational body may and should possess. Considerations of this character, unquestionably, moved the General Assembly to commit to the department of education so broad a sweep of powers.

The abolishment of the district and the district committee, and the devolution upon the department of education in general terms of the powers of the district and its committee, in our opinion, conferred, and was intended to confer, the power to select school sites and the power to purchase school sites upon the department of education, free from the control of any other municipal body, upon compliance with and in conformity to the other provisions of the Act. Our construction of this Act is aided by § 14 of the Act, providing that the city may take school sites by condemnation upon recommendation of the board of education. Here is a grant of power where none was needed, if the board of

aldermen already had the general power to select and purchase sites. And the grant is made subject to the recommendation of the board of education. It is an extension of the jurisdiction of the board of aldermen, and yet no limitation upon that granted the board of education, since that board has never had the right to condemn; and public policy is best served by committing this power to the legislative department and preserving autonomy in the selection of school sites by limiting the power to condemn to the site selected by the educational authority. A study of other municipal charters in reference to the deposit of power over educational affairs, shows that the Waterbury Act is not unusual. We think the position of the defendant, that either the city or the board of aldermen, and not the department of education, has the power to select and purchase school sites, is unsound.

A further contention of the city is, that if the board of education possessed the power to select and purchase school sites it had in this case exhausted its power by devoting the specific appropriation "No. 56, New School and Land North End, $40,000," to the purchase of the Hill Street site and the erection of a building thereon, and that it could not use the unexpended balance of the appropriation for the Chatfield site, but that such balance had been, by the terms of the charter, covered into the treasury of the city and became a part of its unappropriated revenues.

The board of education cannot buy or agree to buy without first securing an appropriation to meet the proposed expenditure. It is a department of the city and must, by the terms of the Act of its origin, comply with §§ 92 and 93 of the revised charter (12 Special Laws, pp. 434, 459). As we have pointed out, it must first file its estimate of its expenses with the board of finance, which considers the estimates of the several

departments of the city and then prepares its own estimate, which it submits to the board of aldermen. That board makes its own estimate, accepting or modifying, or, by pursuing a given method, adding to, the estimates of the board of finance, and then appropriating funds to meet its estimates for the several departments. This method is a budget method of making appropriations, carefully devised for the protection and expenditure of the municipal funds. The purse strings are in the keeping of the board of aldermen. Practically every proposed municipal expenditure must be submitted to this board.

In the instances upon the record, the board of education included in its estimate the sums it desired for the school sites or schools it had determined upon. That appears to have been the ordinary course. An appropriation made in pursuance of such an estimate was a special appropriation made for a specific purpose, viz., for a designated school or school site. This is not the only method by which an appropriation for schools or school sites can be made. We see no legal objection to the board of aldermen voting a general appropriation for schools or school sites, and leaving the expenditure of this appropriation for these purposes to the discretion of the board of education. But in no case can the board of education purchase school sites, or build schools, in the absence of an appropriation duly made in one of these methods.

Appropriations of municipal funds, whether general or specific, for a given object or a definite purpose, cannot be diverted to any other purpose. This is a general rule of the law.

Section 93 of the charter of 1895 (12 Special Laws, p. 459) provides: "Any appropriation, regular or special, so made for any specific purpose shall not be expended for any other purpose, but, if unexpended, shall be

covered back into the treasury thirty days after the expiration of the fiscal year for which it is so made."

The plaintiff was bound to know the limitations of the power of the board of education to contract; and the charter provisions, so far as they affected this board, became a part of its claimed contract. The board asked for a specific appropriation for a new Locust Street school, which location was in the section of the city known as the North End. The board of aldermen made the appropriation for "New School and Land North End, $40,000." This was a specific appropriation, not for new schools, but for a new school. The board of education had requested it in its estimate, and the appropriation as made was responsive to its request, and must be read in connection with it. It was an appropriation for a school to be located in any part of the section known as the North End. The estimate of the board of education located the new school on a designated street; the board of aldermen made its appropriation for a designated section. It extended the range of selection of the board of education. That board, when it selected the Hill Street site in the North End and built a school thereon at an expenditure of $22,000 from the $40,000 appropriated for a new school in the North End, exercised the discretion vested in it to use this appropriation for a new school in the North End. It cannot use the balance of the unexpended appropriation either for another school site or any other school purpose. Its power over the appropriation was exhausted when it purchased a site and built a school thereon in the North End.

The board of aldermen had the undoubted right to appropriate this fund for one school; the board of education cannot disregard the terms of the appropriation and use the fund for several schools. If the departments of the municipality can use the funds voted for

their several departments for specific objects for purposes of their own choosing, the power over the purse strings vested in the municipal legislative body is shorn of much of its efficacy as an instrument for the protection of the funds of the community. When the Hill Street school was finished, the unexpended balance of the appropriation returned to the city treasury thirty days after the expiration of the fiscal year for which it was made. The board of education thus had no power to contract for the Chatfield site.

The plaintiff insists that even though the board of education had no power to divert the balance of the $40,000 appropriation to this purchase, it had from time to time school funds under its control subject to its order. This is far from a finding that it had, subject to its order, funds unappropriated sufficient to meet its contract for the Chatfield site at the time of its making. As we understand the charter, the board of education could have no unappropriated funds in its control; all such were based on estimates, and made for definite objects, from which the board could not divert the funds.

Our view of the case does not require consideration of the defendant's claim that this action would not lie since the plaintiff performed its contract no otherwise than by tendering a deed under which the city was compelled to assume payment of a $3,500 mortgage and a lien upon the property conveyed. To properly pass upon this question would require a fuller consideration of the facts surrounding this transaction, which it is held estop the city in equity and good conscience from making this claim, than we think advisable to give. It suffices to say that the deed tendered was not in accordance with the contract. Whether, in case the board of education had had the power to make this contract, the special facts of this case would have per-

mitted a recovery notwithstanding the defective tender, we leave open.

There is error, the judgment is reversed and the cause remanded with direction to enter judgment for the defendant.

In this opinion the other judges concurred.